# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs July 18, 2012

## STATE OF TENNESSEE v. ROBERT M. DEUNES-CRUZ

**Appeal from the Circuit Court for Montgomery County**
**No. 40801483    Michael R. Jones, Judge**

---

**No. M2011-00879-CCA-R3-CD - Filed January 7, 2013**

---

The Defendant, Robert M. Deunes-Cruz, was convicted by a Montgomery County Circuit Court jury of statutory rape by an authority figure and incest, Class C felonies. See T.C.A. §§ 39-13-532, 39-15-302 (2010). The trial court sentenced the Defendant as a Range I, standard offender to concurrent terms of three years' confinement. On appeal, the Defendant contends that the evidence is insufficient to support his convictions. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Mark R. Olson, Clarksville, Tennessee, for the appellant, Robert M. Deunes-Cruz.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and Arthur F. Bieber, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case relates to events involving the Defendant and his seventeen-year-old stepdaughter while her mother was deployed to Iraq. The Defendant was charged with ten counts of statutory rape and ten counts of incest. At the trial, Clarksville Police Officer Thomas David Walker testified that on December 17, 2007, he responded to an attempted suicide call at the Defendant's home. He said the Defendant had Ibuprofen in his hand and intended to ingest it. The Defendant was taken to the hospital for an evaluation. He said that while the Defendant was at the hospital, the Defendant told him that he had sex with his

seventeen-year-old stepdaughter.  He said that before he left the Defendant's home, he saw two notes on a table, which were received as exhibits.  The first note identified the Defendant's wife, the victim, and his additional children and asked the reader to give the letter he wrote to his family.  The note was signed, "Robert."  In the second note, signed by the Defendant, the Defendant apologized for taking his life and addressed his wife and children individually.  With regard to the victim, the Defendant stated,

> [W]ell you got your wish, baby.  I am sorry things didn't turn out the way it did. I really did love you.  I didn't want to break your heart nor you[r] Mom's. I hope you and your Mom can work things out now that I am not around. . . . I meant what I said about you being the most beautiful woman in the wor[l]d, . . . good luck with your boyfriend, he's a very lucky man to have you.  Good bye my baby, take care because I really care for you.

With regard to the Defendant's son, the Defendant said, "Don't let me down. . . .  Don't let what I did get to you. . . .  I know this was a dumb way out, but it was the only way out. Mom will never give me a second chance.  She's a tough woman, especially what happened between me and [the victim]."  With regard to his wife, the Defendant said, "I love you . . . and I regret what I did.  Now you know it will never happen again because I am gone for good."

On cross-examination, Officer Walker testified that his report stated that the victim was seventeen years old at the time of the incident and that the Defendant only mentioned one incident.  He did not know what happened between the Defendant and the victim, and he did not speak to the victim.

Clarksville Police Officer Misty Darland testified that on December 19, 2007, she went to the hospital to investigate the Defendant, who claimed to have had sexual relations with his stepdaughter.  She said she first spoke to the Defendant about seven hours after Officer Walker arrived at the Defendant's home.  She said the Defendant denied drinking alcohol that day and told her that he "messed up" by having sex with his stepdaughter.  She said the Defendant described one incident when the victim "tricked" him into having sex with her.  The Defendant told her that the victim wanted a new car, that the victim's mother did not want the victim to have the car, and that after he and the victim had sex, the victim "held that over his head" to get the car.

Officer Darland testified that at the police station, the Defendant stated that he was "upset about the whole situation" and that the victim came into his bedroom, entered his bed, and took advantage of his being intoxicated.  She said the Defendant feared the victim's

telling her mother before he could do the same. She said the incident occurred between Thanksgiving and the victim's eighteenth birthday on November 28, 2007.

On cross-examination, Officer Darland testified that the video recording of the Defendant's oral statement had been misplaced. She agreed that the police did not find any DNA evidence and that a rape kit was not performed. She could not recall if the victim refused to undergo a physical examination. She agreed the Defendant came forward about the sexual activity. She said she was present during the victim's forensic interview. She said the victim stated that the sexual abuse had occurred for several years. She said she obtained the dates of the victim's doctor's appointments and denied obtaining the victim's medical records. She denied knowing what the victim told her doctor about her health or sexual activity.

Dr. Whitney Devers, a psychologist at Blanchfield Army Hospital, testified that on December 19, 2007, she met with the Defendant in the emergency room to assess his mental status. She said the Defendant was forty-six years old. She said the Defendant stated that he no longer felt suicidal, that he did not have a plan to hurt himself, and that he only had thoughts about hurting himself. She said that the Defendant and his wife had a big argument about his having a sexual relationship with one of their daughters and that the victim reported to the police that he raped her. Although she did not recall the name of the daughter, she said the Defendant told her the daughter was seventeen when they had sex. She said that she did not ask questions about the sexual activity but that the Defendant told her that the victim "approached him about having sex because she was trying to get him to buy a car." On cross-examination, she stated that the Defendant reported a single occasion of sex with the victim. She said the victim was not present for the assessment and denied speaking to anyone other than the Defendant.

The victim testified that she was born on November 28, 1989, that she turned eighteen in 2007 and that she was fifteen years old when she and her family moved to Clarksville, Tennessee. She said she was the oldest of five children. She said that the Defendant had sex with her after her cousin's wedding in October 2007, one month before her eighteenth birthday. She said that after the wedding, her sisters stayed overnight with her aunt and that she went home with her brothers and the Defendant. She said that the Defendant and her brothers slept on the bed in her mother and the Defendant's room and that she slept on the floor. She stated that during the night, the Defendant laid down beside her on the floor, woke her, and removed her shorts and underwear. She said the Defendant inserted his penis into her vagina. She denied resisting the Defendant and said she did not want to prolong it.

The victim testified about two additional incidents that occurred during the winter months of 2006 and 2007 but before her mother was deployed to Iraq. She said that the incidents occurred in the living room and the dining room while everyone was asleep and that the Defendant had vaginal intercourse with her. She recalled another incident in 2007 after her mother left for Iraq when the Defendant had vaginal intercourse with her. She recalled two incidents in which the Defendant had vaginal intercourse with her while her siblings played at a neighbor's house. She stated that around April or May 2007, near the time of her senior prom, the Defendant had vaginal intercourse with her, although she resisted.

The victim testified that another incident occurred during the summer 2007 while her siblings were at their aunt's home for a party. She said that the Defendant called her and requested she pick him up and that when she arrived, the Defendant came out of his bedroom without any clothes, held down both her hands, and had vaginal intercourse with her. She recalled another incident before May 2007 when the Defendant had vaginal intercourse with her after a dental appointment. She stated that another incident occurred in June 2007 before she obtained her driver's license while she, her siblings, and the Defendant were at her aunt's home. She said that she and the Defendant left her aunt's home and that when they arrived home, the Defendant had vaginal intercourse with her. She recalled one incident in which the Defendant pulled her off the bed by her ankles and onto the floor and had vaginal intercourse with her on the bedroom floor.

The victim testified that all of the incidents occurred inside their home and that the abuse began when she was eleven years old. She denied telling her mother because the Defendant threatened her and said the victim's mother would send her to Guam to live with her biological father. She said she did not want to return to Guam because she did not want to leave her siblings with the Defendant. She said the Defendant told her that the victim's mother loved him more than the victim. She said that she was going to tell her mother when her mother returned from Iraq for her high school graduation but that she feared her mother's not believing her, returning to Iraq, and leaving her with the Defendant.

The victim testified that she obtained her driver's license in June 2007 after she graduated from high school at age seventeen. She said that she began attending Austin Peay State University (Austin Peay) while her mother was in Iraq and that she drove her mother's car to school. She said she asked her mother for a car, who said "it depended on the car." She found a car she wanted and asked the Defendant about it first because her mother was in Iraq. She stated that she hesitated asking her mother about the car and asked the Defendant to talk to her mother about it. She said that in September 2007, the Defendant talked to her mother, who did not want to buy the car because of its low gas mileage and cost. She denied entering the Defendant's bedroom and seducing him to obtain a car. When asked

-4-

if she entered the Defendant's bedroom wearing little clothing, she said she did "at times but not intentionally."

The victim testified that she did not contact the police because she was too afraid to tell her mother or anyone else. She said the first person she told was her mother. She said that she talked to her mother on the telephone and that her mother asked if anything happened between her and the Defendant. Although she did not give her mother detailed information, she told her mother, "Yes, for a long time."

On cross-examination, the victim testified that she was engaged to the man she was dating in 2007. She said she last had contact with the Defendant in December 2007. She agreed she moved out of the family home on November 28, 2007. She said the family home was about 1250 square feet and had three bedrooms, a living room, a dining room, and a kitchen. She said her two sisters shared a bedroom, and she shared a bedroom with her two brothers. She agreed that the television in her mother's bedroom could be heard in the kitchen if the bedroom door were open and the television loud enough.

The victim testified that she had access to doctors and school counselors, although she did not use counselors much. She said that she met her boyfriend on the first day of college in the fall 2007 semester and that they started dating in November or December 2007. She denied telling anyone about the abuse before the Defendant was admitted into the hospital in December 2007. She denied that her doctors believed she had suffered sexual abuse and that her teachers and friends identified problems. She said that when she visited her doctor, she was truthful about "everything but that."

The victim testified that she withdrew from Austin Peay but denied writing a letter to the school detailing the abuse because she wanted her tuition reimbursed. She stated that she wrote the letter because her grades began to fall and she was too worried and stressed to focus on her schoolwork and because she did not want to pay for days she did not attend. She agreed the letter, which was received as an exhibit, was dated August 25, 2008. The letter stated that she reported the Defendant to the police for sexually abusing her while her mother was deployed to Iraq in November 2007. The letter stated her four siblings were still living with the Defendant. The letter also stated that the Department of Children's Services (DCS) required the victim to care for her siblings until the victim's mother returned from Iraq. The victim denied making untruthful statements in the letter. She agreed that she had "stable grades" during high school and that she did not start having problems in school until after the alleged abuse stopped and she began attending college.

The victim testified that on October 16, 2008, she was treated by physician's assistant Susan Vairin and that she denied any abuse or neglect. She said that she might not be truthful with a doctor if she were embarrassed. She said that if she could not confide in the person she loved the most, she probably would not confide in a stranger. Although she agreed she told the school that she had been abused for eight years, she said she did not have to talk to someone from the university face-to-face. She admitted that although she had already told the police, the university, therapists and counselors, friends, and the prosecutors about the abuse, she intentionally did not mention the abuse to Ms. Vairin. She said that she did not tell the truth because "if something was really wrong . . . they would have found it out a long time ago." She admitted being untruthful in some of her statements.

The victim testified that on December 12, 2007, she emailed her sister and that in the email she stated that she had "never slept with any guy." She said that after she enrolled in Austin Peay, she continued to live at home for three months because she wanted to commute rather than live on campus. She agreed she had the ability to live where she wanted. She stated that she did not want to spend time with the Defendant but that she spent time with him during family functions. She said that although the Defendant took her and her siblings shopping for clothes, school supplies, and food, the Defendant did not buy her personal items unless they were shopping as a family. She did not recall the Defendant's buying her underwear.

The victim testified that she did not recall the dates of the abuse. She denied that she entered the Defendant's bedroom at night while he was sleeping to initiate sex with him and denied that she and the Defendant fought about a car she wanted. She said she was not allowed to have the car she wanted because her mother thought the car used too much gas. She said that although she wanted the car, she was not upset that she could not have it because she had her mother's car to drive.

On redirect examination, the victim testified that she attended a full semester at Austin Peay, that her grades began to fall at the end of the semester, and that she missed the final examinations because of the stress she experienced. The victim's college transcript showed five Fs, one C, and one D at the end of the semester. She said that she did not talk to anyone from DCS in August about the letter she wrote to Austin Peay but that she did talk to someone from DCS about the letter in December.

The victim's mother testified that she and the Defendant married in July 2002 and divorced in April 2008. She said that on February 1, 2007, she was deployed to Iraq by the United States Army and that she expected to return sometime in April 2008. She said that before her deployment, the victim did not mention any kind of inappropriate contact with the Defendant. She said that on December 18, 2007, she called home to check on her children.

She spoke to the Defendant and to the victim, who was at a friend's house because the victim and the Defendant had argued. She said the victim cried and said the Defendant "hurt" her. She said the victim told her that the Defendant "got on top" of her. The victim said the Defendant stated that her mother would not believe her and that her mother loved the Defendant more.

The victim's mother testified that she called the Defendant after she hung up with the victim, that the Defendant asked if the victim told her anything, and that she told the Defendant, "No." She said the Defendant told her he had something to tell her when she returned from Iraq. She said that she told the Defendant to tell her what he needed to say and that the Defendant said he had sex with the victim. She said the Defendant told her that the sexual relationship began after June 2007. She said the Defendant told her that the victim "came on to him" and kissed him in front of the other children. She told the Defendant that he was the adult and knew his actions were wrong. She returned to Clarksville on December 22, 2007. She said that after she returned home, the Defendant told her that the sexual relationship began around November 22, 2007, that he awoke one night to find the victim on top of him while lying in bed, and that he pushed away the victim. She ordered the Defendant to leave her home, and he complied.

The victim's mother testified that she owned two cars and that while she was in Iraq, the Defendant and the victim were the only drivers living in her home. She said the Defendant returned sometime around Christmas to pick up one of the cars. She identified a postcard dated December 28, 2007, written in the Defendant's handwriting and addressed to their seven-year-old son. She agreed that the postcard showed a photograph of the City of Coeur D'Alene, Idaho and said that to her knowledge, the Defendant did not have family in the area. She admitted living in Idaho previously with the Defendant and his brother. In the postcard, the Defendant apologized for missing Christmas and mentioned the snow in the area. The Defendant asked his son to tell the victim that he still loved her and missed her and that he thought she was the most beautiful woman in the world, even if the victim hated him. She identified another postcard dated December 28, written in the Defendant's handwriting and addressed to their six-year-old son. In the postcard, the Defendant said that he missed his son and that there were many things for his son to do in Idaho. He asked his son to tell the victim that he loved her and that he hoped they could "get back together again."

The victim's mother testified that in addition to the two postcards, the Defendant mailed a letter addressed to their two sons that arrived on the same day as the postcards. In the letter the Defendant apologized for their mother's not allowing the Defendant to say good bye to them. He asked his sons to tell the victim that he loved and missed her. He said he was leaving their mother for the victim. He said he wanted to be with the victim like they discussed. He said the victim stated that she wanted to be with the Defendant. He asked

their sons to tell their mother that they wanted to live in Idaho with him. To the victim, the Defendant wrote,

> I know you hate me and I don't know why. But remembe[r] when you were crying and said you don't know what will happen to you when you[r] mom get[s] home from Iraq. I told you I want us to be together. All those times we were playing, you know I didn't hurt you. . . . You know I will never do anything to hurt you. I care for you to[o] much to hurt you. Now you hurt me and you left me. That hurts more than anything in the world. . . .

The victim's mother testified that she received a letter from the Defendant in March 2008 stating that she was a strong woman for living with the victim, knowing the victim had an affair with him. The Defendant said the victim did not tell her the truth about what he and the victim did daily when the victim came home from school. He told her to ask their two sons where the victim slept at night when she was in Iraq. He said the victim took him with her to buy underwear and admitted taking twenty-seven pictures of the victim.

On cross-examination, the victim's mother testified that the Defendant's letter referred to her having a boyfriend, that she did not have a boyfriend at that time, and that the Defendant accused her of having a boyfriend. She agreed that they argued over whether she had a boyfriend and that the Defendant's letter was intended to hurt her. She denied, though, that the statements about the victim were false. She said that she believed her daughter and denied that the victim had an inappropriate "attachment" to the Defendant. She denied that the Defendant told her the victim made him uncomfortable. She said that she did not recall taking the victim to the doctor after she returned from Iraq. On redirect examination, she stated that although her statement to the police only referred to what the Defendant told her, the victim told her that the Defendant grabbed her.

The Defendant testified that he never initiated sexual activity with the victim and that before moving to Tennessee, he did not have sexual intercourse or penetrate the victim. He said that on November 22, 2007, he attended a Thanksgiving Day party, which also celebrated the victim's and her sister's birthdays. He said the victim turned eighteen the following week. He admitted to drinking heavily that night and said Frank Santos, the host of the party, suggested that the victim drive home. He said they arrived home around 2:00 or 2:30 a.m. He said that after they arrived home, everyone went to their bedrooms for the night. He said that about two and one-half hours later, the victim entered his room, climbed on top of him, and began having intercourse with him.

The Defendant testified that when he awoke, he thought he was going to vomit due to the alcohol he drank but that he could not get up because "something was pushing" him down. He turned on the light and saw the victim, who was naked, sitting on top of him. He said the victim "started performing sex with [him]." He said he pushed her off him and asked what she was doing. He said the victim picked up her clothes, walked toward the bedroom door, turned around, and said, "I got what I wanted." He said the victim went to her bedroom. He said he cleaned himself and put on his clothes. He said that he saw the victim's bedroom door open, that he entered her room, and that he asked the victim why she was behaving that way. He said that the victim did not respond. He said that the victim was lying in bed and that she got up, turned off the lights, and went to sleep.

The Defendant testified that the next morning, he awoke to the sound of the front door closing. He said that when he reached the front porch, he saw the victim running to the car. He said the victim stated that she had to get to school for a "lab class." He said he told the victim that there was no school because it was "Black Friday." He said that the victim drove away and that he did not see the victim until 8:30 p.m. He said that after the victim arrived home, she went to her room for the night without talking to anyone.

The Defendant testified that on the morning of December 8, 2007, he left home to help a friend prepare for a surprise birthday party and that the victim stayed home. He said the victim stayed overnight at a friend's home. He said that the victim was supposed to return home the next day but that she did not return. He said the victim "just moved out." He said that although the victim did not have a cell phone, the victim had access to her friend's cell phone. He denied controlling the victim and said the victim could do what she wanted, as long as her mother approved.

The Defendant testified that he did not have sexual relations with the victim, that he did not encourage the victim to have sex with him, and that he never threatened the victim "if she told anyone anything." He said he believed the victim accused him of having sex with her because she wanted revenge. He said the victim was angry because she did not get the car she wanted. He said that he earned about $2500 making lunches for the elementary school and the military, that he gave the money to the victim as a down payment for a car, and that the victim's mother took the money from the victim to buy living room furniture. He said the victim's mother wanted the victim to work for a car. He said the victim asked him to talk her mother into getting the victim a car.

The Defendant testified that he never touched the victim inappropriately and that he treated the victim like a daughter. He said the victim called him Daddy. He said that the family home had two bedrooms, a den, a living room, a dining room, a kitchen, and one bathroom. He said the den was converted into a bedroom for two of the girls. He said that

the victim and the oldest son slept in one bedroom and that he, the victim's mother, and the youngest son slept in the other bedroom.

The Defendant testified that on September 3, 2003, he had heart surgery to repair blocked arteries, that he was "debilitated" for about three weeks, and that it took about nine or ten months to recover. He said that he continued to take medications for high blood pressure and cholesterol and that the medications caused erectile dysfunction, preventing him from having sex. He denied sexually assaulting the victim. He said that he was about five feet, five inches tall and that he was shorter than the victim.

The Defendant testified that he did not deal well with the victim's being on top of him and that he had nobody to talk to about it. He said that he did not attempt to commit suicide. He said he only told the police and his therapist about the one incident in November. He said that he loved his children, including the victim, and denied that he loved the victim in an "unnatural way."

The Defendant testified that the victim did not want to live with her mother anymore because of physical abuse. He said that when the victim and her sister were young, the victim's mother made the girls "fist fight" until they drew blood and that if they did not cause the other to bleed, the victim's mother became angry. He said that the victim's mother whipped the children with belts, pipes, sticks, and brooms. He denied wanting to live with the victim as "lovers." He said he wrote the letter to the victim's mother because he was angry and wanted to hurt her because he was told the victim's mother had an affair while in Iraq. He said the contents of the letter were untrue, including his having a girlfriend, his being in love with the victim, his taking the victim shopping for underwear, and his taking pictures of the victim. He agreed his writing the letter was "stupid."

On cross-examination, the Defendant testified that although his medication made it difficult for him to achieve an erection, on November 22, 2007, he achieved an erection after taking his medication and drinking to excess. He said the victim "had sex with [him]" and denied penetrating her. He admitted telling Officers Walker and Darland and Dr. Devers that he had sex with the victim. He denied being obsessed with the victim's "activities." He said the victim was told that she could have car as a graduation gift. He agreed he had parental authority over the victim while the victim's mother was in Iraq.

The Defendant testified that he told Officer Darland that the victim violated him and that he did not violate the victim. He denied telling Officer Darland that the victim falsely accused him of rape and that he "wanted to beat her to the punch." He denied knowing the victim's reasoning for lying and said he believed the victim lied because she wanted a car. He agreed it was the victim's mother who prevented the victim from having the car.

-10-

The Defendant testified that he knew the victim's mother would read the letter he wrote to his sons and that he knew his sons could not read the letter. He denied having sexual thoughts about the victim. He agreed the victim was eighteen and when asked what that meant to him, the Defendant said, "She gotten [sic] older." He said he understood that the victim became an adult when she turned eighteen years old. He denied having control over the victim before she turned eighteen. He said that he thought the victim had a boyfriend while she attended high school and that it did not bother him. He denied knowing how to operate a computer or how to type. On redirect examination, he stated that on November 23, 2007, he learned from the victim's sister that the victim had a boyfriend, that he was not jealous, and that he did not know who her boyfriend was and did not attempt to find out.

The jury acquitted the Defendant of nine counts of statutory rape by an authority figure and nine counts of incest. The jury convicted the Defendant of one count of statutory rape by an authority figure and one count of incest related to the incident that occurred in October 2007. The trial court sentenced the Defendant to three years for each conviction to be served concurrently. This appeal followed.

The Defendant contends that the evidence is insufficient to support his convictions. He argues that the evidence did not establish a required culpable mental state. With regard to the incest conviction, he argues the evidence did not establish that he initiated the sexual contact. The State responds that the evidence is sufficient to support the Defendant's convictions. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. See State v. Bland, 958 S .W.2d 651, 659 (Tenn. 1997).

Relevant to this appeal, statutory rape by an authority figure is defined as

the unlawful sexual penetration of a victim by the defendant or of the defendant by the victim when the victim is at least thirteen (13) but less than eighteen (18) years of age, the defendant is at least four (4) years older than the victim, and the defendant had, at the time of the offense, parental or custodial

authority over the victim and used the authority to accomplish the sexual penetration.

T.C.A. § 39-13-532(a)(1), (2), (4) (2010). Sexual penetration is defined as "sexual intercourse, . . . or any other intrusion, however slight, of any part of a person's body . . . into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Id. at § 39-13-501(7).

The State is required to establish a defendant's culpable mental state "unless the definition of an offense plainly dispenses with a mental element." Id. at § 39-11-301(b). When a statute does not provide or plainly dispense with a mental element, "intent, knowledge or recklessness suffices to establish the culpable mental state." Id. at § 39-11-301(b); see State v. Hill, 954 S.W.2d 725, 726 (Tenn. 1997). We conclude that Tennessee Code Annotated section 39-13-532 does not plainly state or dispense with a culpable mental state and that the State was required to prove that a defendant, at a minimum, recklessly engaged in sexual penetration of the victim when the defendant had, at the time of the offense, parental or custodial authority over the victim and used the authority to accomplish the sexual penetration. See State v. Ballinger, 93 S.W.3d 881, 890 (Tenn. Crim. App. 2001) (concluding that recklessness sufficed in a prosecution for statutory rape when the statute did not reference or dispense with a culpable mental state); see also Hill, 954 S.W.2d at 726 (concluding that recklessness sufficed in a prosecution for aggravated rape when the statute did not reference or dispense with a culpable mental state).

In relevant part, incest is defined as "the sexual penetration as defined in § 39-15-501, with a person, knowing the person to be, without regard to legitimacy[,] the person's . . . stepchild." T.C.A. § 39-15-302(a)(1) (2010). The State is required to establish that the defendant "had knowledge of the familial relationship" with the victim. State v. Vann, 976 S.W.2d 93, 106 n.6 (Tenn. 1998).

With regard to the statutory rape by an authority figure conviction, the evidence shows that the Defendant told Officers Walker and Darland and Dr. Devers that he had sex with the victim, who was his seventeen-year-old stepdaughter. The Defendant was more than four years older than the victim and was forty-six years old in October 2007. The victim testified that on the night of her cousin's wedding in October 2007, the Defendant laid down beside her while she slept, woke her, removed her shorts and underwear, and had vaginal intercourse with her. The victim did not tell her mother because the Defendant told her that her mother would send her to Guam to live with her biological father. The victim did not want to live in Guam and did not want leave her siblings, who also lived with the Defendant. The Defendant also told the victim that her mother would not believe her and that her mother loved the Defendant more than her.

-12-

At the time of the incident in October 2007, the Defendant was the victim's stepfather. The victim's mother was in the United States Army, deployed to Iraq on February 1, 2007, and did not return until December 2007, when she learned of the sexual abuse. During her deployment, the Defendant was the primary caregiver and admitted having parental authority over the victim while her mother was in Iraq. The Defendant said that he treated the victim like his daughter and that the victim called him Daddy. We conclude that a rational trier of fact could have found beyond a reasonable doubt the elements of statutory rape by an authority figure, including the required mental culpability.

With regard to the incest conviction, the Defendant argues there is no evidence that he initiated sexual intercourse with the victim and that the jury discredited the victim's testimony with the exception of the incident which the Defendant admitted. The Defendant admitted having vaginal intercourse with the victim, whom he knew was his stepdaughter. The victim testified that after her cousin's wedding in October, the Defendant laid down beside her while she slept, woke her, removed her shorts and underwear, and had vaginal intercourse with her. We conclude that a rational trier of fact could have found beyond a reasonable doubt the elements of incest, including the required culpable mental state.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE